CARLTON, Justice.
Writ of Habeas Corpus was granted in this cause and a return was required. After considering the return, we appointed a Commissioner for the purpose of determining to what extent petitioner may have been deprived of his constitutional rights. See 221 So.2d 735 (Fla.1969).
We granted the Writ because we were concerned with the following ' allegation, *2 which seemed to be supported by excerpts from the trial testimony:
“Petitioner’s detention is without lawful authority and in violation of his constitutional rights, fundamental to both the Constitution of the United States and the Constitution of the State of Florida, in that:
“a) At the trial of the cause, the prosecution introduced oral statements made by Petitioner secured after Petitioner was taken into custody;
“b) Such statements included admissions which tended to establish the guilt of Petitioner, as well as other statements which would deny his guilt;
“c) The record establishes that prior to such statements Petitioner was not warned by the arresting officers that he had a right to remain silent; that any statements he made could be used as evidence against him; or that he had the right to the presence of an attorney, either retained or appointed. Exhibit 2.
“d) Petitioner’s trial date, June 29, 1966, was subsequent to the decision of the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), which decision establishes that use of such statements at trial in the absence of a showing that Petitioner was apprised of his constitutional rights is a denial of due process of the law.”
After the appointment of the Honorable Harold R. Vann, Circuit Judge of the Eleventh Judicial Circuit, as Commissioner, petitioner and respondent submitted to Judge Vann the following “Stipulated Statement of Facts” for his consideration:
“1. The Petitioner was tried in the Criminal Court of Record in and for Dade County, Florida, without a jury, on a three count Information, charging Robbery (Count I), Aggravated Assault (Count II) and Malicious Destruction of Personal Property (Count III). Petitioner was found guilty on each of the three counts, and the sentences imposed were, respectively, twenty years imprisonment under Count I; five years imprisonment to run concurrently under Count II; and time served under Count III.
“2. Witness Eddy (the victim) testified that while waiting in his automobile to enter the traffic on 27th Avenue in Miami, a coral ro'ck crashed through the closed auto window on the driver’s side, striking him in the shoulder (R. 5). Immediately thereafter, the driver’s door was opened by the Petitioner, one of a group of five (R. 7). His assailants succeeded in dragging Mr. Eddy from his automobile and grabbing his wallet, all the while punching him about the face and attempting to rip off his wrist watch (R. 7-8). After repeated cries for help, the boys ran away (R. 10).
“A patrol car appeared and gave chase (R. 10), returning with the Petitioner (R. 20). Mr. Eddy did not immediately identify Petitioner as one of his assailants (R. 20), stating to the police that ‘he wasn’t certain, that he wasn’t positive’. (R. 40) Police Officer Waiters told Mr. Eddy that he would ask the suspect some questions ‘ * * * to see if he could recognize his voice, or anything.’ (R. 41) After Petitioner began speaking, ‘Mr. Eddy remembered’. (R. 41)
“3. The Petitioner testified that he came upon ‘ * * * three guys there with Mr. Eddy in the car, beating him hard as hell.’ (R. 50) He went to the victim’s assistance, was hit by one of the assailants and fell down, cutting his hand. (R. 50)
“Upon his leaving the scene, Petitioner testified that he was accosted by two men driving in an automobile who identified him as one of the assailants. Short *3 ly thereafter, he was returned to the scene by two police officers. (R. 50-51)
“4. One witness for the State testified that he came upon three men beating a fourth in an automobile, proceeded on to his destination and picked up two friends. He then returned to the scene. (R. 25) The assailants were chased, but this witness could not identify the Petitioner as one of the group. (R. 27)
“The second witness giving chase did not see the assault and therefore, could not identify Petitioner as one of the assailants. (R. 31)
“The third witness identified the Petitioner as one of the men chased from the scene of the fight. (R. 33)
“5. When accosted in a house which was three blocks from the area in which the- assault had taken place, the arresting officer noted ‘quite a bit of sweat’ on Petitioner’s forehead and face and asked him ‘what he was running from’, (R. 35) Petitioner’s counsel objected to further testimony along this line, and the objection was sustained. This officer testified that he asked to see Petitioner’s hands, and upon examination, fresh blood was found on both palms. (R. 36) The Petitioner was thereupon informed that the police were going to take him back to the scene of the incident, ‘for some people to look at him, and that we wanted to ask him some questions’. (R. 36).
“6. The Petitioner was returned to the scene of the assault. Mr. Eddy could not immediately identify him, so the police began an interrogation in order to establish a voice identification.
“Subsequent to identification, the police ‘began to look the suspect over more closely’ (R. 41), finding blood on his hands. Petitioner was asked at this time if he could explain the blood and, according to the testimony of the arresting officer, Petitioner ‘mentioned something about being in a fight or scuffle earlier in the night at some other place’. (R. 42)
“Petitioner was also asked who else was with him, and he denied anyone being with him. (R. 42)
“At some time during this interrogation, Petitioner was placed under arrest. The arresting officer testified that he did not recall advising Petitioner prior to this interrogation of his constitutional rights.
“7. Petitioner testified that when he was returned to Mr. Eddy’s presence, he was asked by the police if he was ‘one of the fellows that had jumped him’. (R. 51) He was also asked whether he had had anything to drink (R. 51), and how he got blood on his hands. (R. 52) In response to the latter question, Petitioner first told the police that he had tried to defend himself (presumably in defense of Mr. Eddy); and upon being told to ‘shut up’, he told the police that he got into another fight. (R. 52).”
Judge Vann, after considering the trial testimony, the above stipulation, and after conferences with the attorneys in this cause, submitted to this Court the following report:
“This matter having been referred to me as a commissioner to determine to what extent the testimony complained of may have been constitutionally inadmissible, and after conferences with counsel for the State and for the defendant, and counsel having agreed that no additional testimony should be taken, and after having reviewed the record in this matter, it appears that the petitioner was not fully advised of his rights by the arresting police officers in the manner and in keeping with the decisions of this State and of the Federal courts.
“I therefore recommend that this Court take such action as necessary, as the defendant has not been afforded the appriate constitutional rights.
“Dated this 15th day of July, 1969.
(s) Harold R. Vann
Harold R. Vann
Circuit Judge”
*4 After reviewing the testimony produced at trial, and considering the stipulations agreed to by petitioner and respondent, we find that we are in agreement with Judge Vann that petitioner’s constitutional rights have been violated. Petitioner became the focal point of suspicion when he was picked up and returned, or brought to, the scene of the incident. The victim could not recognize him. The officers told the victim that they would “ask the suspect some questions” so that the victim could “see if he could recognize his voice or anything”. Upon hearing petitioner’s response to the officer’s interrogations, the victim then recognized petitioner as one of his assailants. These events were testified to at trial, and this testimony undoubtedly affected the judgment of the Court, sitting without a jury. We must hold that this procedure constituted fundamental error and a denial of due process. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966); Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).
Finding as we do that the ultimate conviction of the petitioner was obtained as a result of a proceeding in which he was denied due process of law, petitioner must be discharged from custody under that pretended judgment but he shall be kept in custody by the appropriate officers of respondent and held and safely kept until the further order of the Criminal Court of Record, Dade County, Florida, on the charge of the information pursuant to which he was originally incarcerated. In sum, the petitioner shall be detained subject to the event of another trial in due course of law. See Cash v. Culver, 122 So.2d 179 (Fla.1960).
It is so ordered.
THORNAL, ADKINS and BOYD, JJ., concur.
ERVIN, C. J., concurs specially with opinion.